PERRY et al. v. SPRECKLES' SUGAR–REFINING CO.

(District Court, E. D. Pennsylvania. July 1, 1901.)

No. 67.

**SHIPPING—CONSTRUCTION OF CHARTER—DEMURRAGE.**

A charter for a steamer to carry a cargo of sugar required her to proceed with her cargo to a designated port of call in the United States. It allowed 15 days as lay days for loading and for awaiting orders at the port of call, but all such days were consumed in loading. It provided that legal holidays should not count as lay days, and required the owners or master to report to the charterer by telegraph the arrival of the steamer at the port of call. She arrived there on Saturday afternoon, which was a legal half holiday, both at such port and at the charterer's place of business. Notice of her arrival was sent the charterer; but, its office being closed, it was not received until Monday morning, when it was at once acted on. *Held,* that under the provisions of the charter notice of arrival could not be given, which the charterer was bound to receive and act upon, until Monday morning, and that it was not liable for demurrage during the intervening time.[1]

In Admiralty. Suit for demurrage under charter.

Biddle & Ward and N. Dubois Miller, for libelants.
John G. Johnson and J. Wilson Bayard, for respondent.

[1] Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337, and Hagerman v. Norton, 46 C. C. A. 4.

J. B. McPHERSON, District Judge.  The libelants, who are the chartered owners of the steamship Hutton, entered into a charter party with the American Sugar-Refining Company, in March, 1900, by virtue of which the steamer was to load a cargo of sugar at a certain port or ports and proceed thence to the Delaware Break-water, there to await orders to discharge either at New York, Phila-delphia, Boston, or Baltimore.  The following provisions of the charter party concern the present dispute:

"Fifteen working days as lay days are to be allowed to said charterers for loading the said steamer at port or ports of loading, and waiting for orders at port of call; the master engages to take an additional number of native workmen on board at steamer's expense to accelerate the stowing of cargo, and, if desired by charterers or their agents, to give 24 hours' notice beforehand for the quantity of cargo he requires to be shipped day by day, and to pay demurrage, if any, for boat loads so ordered and detained beyond the customary time.  Such working days in all ports to commence within the same time and under the same conditions as stipulated in section 1 of this charter party with regard to orders for loading the ship, say 12 hours after the master has given written notice, and the cargo to be taken out with customary dispatch for steamers at port of discharge.  Ten days on demurrage over and above said working days at 6d. per net register ton per running day.  Time occupied in shifting, ports of loading, and detention of steamer by causes over which charterers have no control, viz. quarantine, ice, hurricane, blockage, clearing of the steamer after the last cargo is taken over, also Sundays, custom-house and bank holidays, or any other holidays according to the custom of the port throughout this charter, not to count as lay days unless so used.  The steamer to load on Sundays and/or any holidays if required by charterers, in such case counting as working days."

"The captain or owners are bound to report to charterers' agents, or to the consignees of the cargo in the United Kingdom, or on the continent, or in the United States, the steamer's arrival at port of call in the United States as above by telegraph, and to wait for their orders at the port of call, provided the names of such agents or consignees are given to the cap-tain at the last loading port."

Under the contract, the ship sailed to Java and there took on 4,800 tons of sugar.  The loading occupied 15 days and 6 hours, and the master thereupon made a claim for demurrage for a quar-ter day, which was duly paid.  The ship then proceeded to the Dela-ware Breakwater, where she arrived on Saturday, September 8, 1900, at about 12:50 p. m.  As she approached the port, Messrs. Burbage & Co., who are agents of the American Sugar-Refining Company at the Breakwater, telegraphed to the company in New York, as follows: "Steamer Hutton just arrived 1 p. m.  Waiting orders."  Within the next two hours the agents had an interview with the master on board the ship, and at 3 o'clock telegraphed again to the company in New York as follows: "Steamer Hutton has no time left to await orders.  Was quarter day on demurrage loading Java."  These telegrams reached New York promptly, and were delivered without delay to the janitor of the building occu-pied by the American Sugar-Refining Company; but, as the offices of the company had closed at 12 o'clock, and as the next day was Sunday, the telegrams did not reach the hands of the proper offi-cial until Monday morning shortly after 9 o'clock.  Upon that day, instructions were sent to Messrs. Burbage & Co. as follows: "Please instruct captain of steamer Hutton to receive instructions from

Spreckles' Sugar-Refining Co., Philadelphia." This telegram was received at 11 o'clock, and communication was immediately established between the Spreckles' Sugar-Refining Company and Messrs. Burbage & Co.; the respondent sending instructions both by telephone and telegraph that the Hutton should proceed at once to Philadelphia. The captain began the voyage as soon as possible, and left the breakwater about 2 o'clock, arriving in Philadelphia on September 11th, and entering the ship at the custom house on the same day. The custom of the port of Philadelphia allows a rate of 500 tons per working day for the discharge of sugar, and therefore, according to this custom, the ship would have been permitted to take 9½ days to unload her cargo. The discharge, however, was completed by the respondent's stevedores in 3½ working days, thus saving 6 days to the chartered owners.

The dispute concerns the time consumed at the breakwater awaiting orders, a period of 1 day and 23 hours. The demurrage claimed is 6d. per net registered tonnage of 2,346 tons, or $559.23, and the question is upon whom, under the provisions of the charter party, this loss must fall.

Whatever might have been the obligation of the American Sugar-Refining Company to acquaint itself with the arrival of the ship at the port of call, in case no provision upon that subject had been put into the contract, it seems to me quite clear that, under the express provision above quoted, the American Refining Company was not required to give any sailing orders at the breakwater until the captain or owners had reported to New York that the vessel had arrived at the port of call. This, in terms, is the undertaking of the chartered owners; for I see no room for doubt concerning the meaning of the words used by the parties. When, therefore, the steamship arrived upon a holiday,—for Saturday afternoon is a legal holiday both in the state of New York and in the state of Pennsylvania,—it was impossible for the ship to comply with her agreement upon that day. There was no more obligation upon the American Sugar-Refining Company to keep its offices open during the legal half holiday of Saturday than upon the Sunday following; and, although the result was that the vessel was unable to give notice until Monday morning, it seems to me that this result was not the fault of the refining company, but was an unlooked-for accident, the consequences of which must rest where they have fallen. In the absence of fault upon the part of the refining company, I see no ground upon which I can shift the loss from the vessel to the charterer. In the present case, this conclusion is the more equitable, because the celerity with which the ship was discharged by the respondent's stevedores in Philadelphia benefited the libelants much more than they were injured by the delay for which they are now claiming demurrage.

The libel must be dismissed at the costs of the libelants.